T.C. Memo. 2015-117

UNITED STATES TAX COURT

KURT ANTHONY STRODE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1197-12, 17358-12.               Filed June 25, 2015.

On his 2008 and 2009 Federal income tax returns P reported
(1) significant wage income from full-time employment and (2)
business losses resulting from deductions claimed and, for 2009,
gross receipts reported, on Schedules C, Profit or Loss from Business.
R issued notices of deficiency for both tax years. In the notices R
determined that the activity allegedly generating the gross receipts
reported and the expenses underlying the deductions claimed on P's
Schedules C had not been engaged in for profit. R further determined
that P had not adequately substantiated the expenses underlying
claimed deductions. R also determined I.R.C. sec. 6662(a) accuracy-
related penalties for both years. P contends that he engaged in his
Schedule C activity for profit and that he has adequately substantiated
his expenses.

<u>Held</u>: P is liable for the deficiencies.

<u>Held</u>, <u>further</u>, P is liable for the accuracy-related penalties.

[*2]  Douglas E. Klein, for petitioner.

Willis B. Douglass, Eric M. Heller, and Jenny R. Casey, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WHERRY, Judge:  Respondent determined the following deficiencies in petitioner's Federal income tax and consequent section 6662(a) accuracy-related penalties:[1]

| Determination | 2008 | 2009 |
|---|---|---|
| Deficiency | $24,213 | $15,496 |
| Penalty-- sec. 6662(a) | 4,843 | 3,099 |

The issues presented for decision are:  (1) whether for 2008 and 2009 the activity reported on petitioner's Schedule C, Profit or Loss from Business, was an activity not engaged in for profit within the meaning of section 183(c); (2) whether and to what extent petitioner is entitled to the deductions claimed on his Schedules

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

**[\*3]** C for 2008 and 2009; and (3) whether and to what extent petitioner is liable for section 6662(a) accuracy-related penalties for the tax years at issue.

FINDINGS OF FACT

Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. Petitioner Kurt Anthony Strode lived in California when he filed his petitions.[2] Petitioner neither appeared nor testified at the trial, and the only evidence submitted at the trial consists of the stipulated facts and exhibits.

---

[2]Respondent mailed separate notices of deficiency, and petitioner filed separate petitions in this Court, for petitioner's 2008 and 2009 tax years. For the 2008 tax year respondent mailed the notice on October 14, 2011, and petitioner timely mailed his petition on January 6, 2012. See secs. 6213(a), 7502. The Court assigned docket No. 1197-12 to that petition (2008 case). For the 2009 tax year, respondent mailed the notice on April 19, 2012, and petitioner's petition was timely filed on July 9, 2012. See sec. 6213(a). The Court assigned docket No. 17358-12 to that petition (2009 case). We granted respondent's motion to consolidate the 2008 and 2009 cases on February 5, 2013.

This Court previously issued an opinion in two consolidated cases involving petitioner's 2005 and 2007 tax years (earlier cases) and presenting facts and issues nearly identical to those now before us. See Strode v. Commissioner, T.C. Memo. 2012-59, 103 T.C.M. (CCH) 1276 (2012). As to those tax years, we agreed with the Commissioner that P had not shown Intcom was an activity engaged in for profit; and because P reported no gross receipts for Intcom, we disallowed his claimed deductions. Id., 103 T.C.M. (CCH) at 1279 & n.7. On November 9, 2012, petitioner appealed our decisions to the U.S. Court of Appeals for the Ninth Circuit, which assigned the cases docket Nos. 12-73656 and 12-73657. Petitioner thereafter sought and obtained three consecutive stays of appellate proceedings pending our ruling in the 2008 and 2009 cases. On July 28, 2014, the stay was lifted. The cases on appeal are now fully briefed but have not been set for argument.

**[*4]**  During the tax years at issue petitioner worked at least 40 hours per week as an attorney for and employee of Monarch HealthCare, A Medical Group, Inc. (Monarch).  The Court takes judicial notice of the State Bar of California's records reflecting that petitioner has been a member of the California Bar since December 1992.

Petitioner filed Forms 1040, U.S. Individual Income Tax Return, for the 2008 and 2009 tax years.  On each of those returns he reported salary income, presumably from Monarch.[3]  With each return he also filed a Schedule C on which he claimed deductions for expenses and, for 2009, reported limited gross receipts.  The Schedules C identified petitioner's business activity as "International Consulting" and the name of his business as "Intcom".  Intcom's business address is petitioner's home address.  For the 2003 through 2012 tax years petitioner reported on his Forms 1040 (1) salary income, (2) gross income, expenses, and net profit or loss from Intcom, and (3) adjusted gross income, as follows:

---

[3]The copies of petitioner's 2008 and 2009 income tax returns admitted into evidence do not include Forms W-2, Wage and Tax Statement.

| [*5] Year | Salary income | Gross income | From Intcom | | Adjusted gross income |
|---|---|---|---|---|---|
| | | | Expenses | Net profit (loss) | |
| 2003 | $125,741 | --- | $35,263 | ($35,263) | $91,988 |
| 2004 | 135,527 | --- | 70,892 | (70,892) | 67,268 |
| 2005 | 137,069 | --- | 80,345 | (80,345) | 62,217 |
| 2006 | 133,527 | --- | 88,578 | (88,578) | 49,606 |
| 2007 | 138,750 | --- | 84,240 | (84,240) | 59,501 |
| 2008 | 159,229 | --- | 88,184 | (88,184) | 77,329 |
| 2009 | 165,305 | $5,000 | 91,808 | (86,808) | 94,710 |
| 2010 | 172,779 | --- | 41,818 | (41,818) | 47,345 |
| 2011 | 967,058 | --- | 44,071 | (44,071) | 926,849 |
| 2012 | 219,103 | --- | 32,825 | (32,825) | 198,863 |
| Total | 2,354,088 | 5,000 | 658,024 | (653,024) | 1,775,676 |

Respondent examined petitioner's 2008 and 2009 tax returns. In connection with or during respondent's examination of the 2008 return, petitioner sent respondent a document entitled "ATTACHMENT: RESPONSES TO QUESTIONS ON FORM 866-A [sic]".[4] In that document, petitioner claimed,

---

[4]The Court admitted this document into evidence as Exhibit 40-P over respondent's objection because respondent conceded that a copy of the document was in the Government's administrative file. In addressing respondent's hearsay objection, we noted that the document need not be introduced for its truth but for the purpose of proving its existence--i.e., that petitioner disputed respondent's proposed adjustments to his 2008 tax return in writing in the manner reflected in the document. He introduced no evidence to corroborate the statements made in

(continued...)

**[*6]** inter alia, that Intcom provides services such as "[i]dentify[ing] potentially lucrative business opportunities that will generate substantial income and profit for IntCom and its clients", "[d]etermin[ing] the best markets for your company's products through ISA and industrial analysis reports", "[d]evelop[ing] an effective marketing strategy for your product", "[e]valuat[ing] international competition", "[i]dentify[ing] legal and regulatory issues", "[l]ocat[ing] financing and development [sic] projects that support manufacturing and promotion of products", and "[i]dentify[ing] programs (i.e. USAID, EXIM Bank, World Bank, United Nations, etc.)".  This list also includes the entries "[n]egotiat[ing], licens[ing], manufactur[ing], writ[ing] contracts, and settl[ing] trade disputes" and "procurement and contract bid[ding]".

On subsequent pages, the document describes various business ventures in which Intcom allegedly engaged from 2002 through 2008.  The listed ventures, which range from establishing a beauty salon (in 2005) to exploring the possibility of importing "non-weapon military equipment" (in 2007) to exploring the

---

[4](...continued)
the document.  We therefore treat the document as what it is:  the embodiment of petitioner's claims concerning his Intcom activity.  We give it less evidentiary weight than we would oral trial testimony having identical content because it was not subject to cross-examination and because the Court has had no opportunity, in these cases or the earlier cases, to evaluate petitioner's credibility.  In both sets of cases, he neither testified nor appeared for trial.

**[*7]** feasibility of investing in real estate (in 2006, 2007, and 2008), were generally sited in the Philippines or in Las Vegas and had nearly all been abandoned.[5] The document describes Intcom's business plan as follows: "Engage in international trade of U.S. companies into foreign markets, engage in international trade of foreign companies into U.S. markets, and invest in developing businesses in foreign markets all with the intent to produce income and profit. Some projects have specific business plans or prospectus [sic]."

For 2008 respondent determined that petitioner had not "establish[ed] that the activity on Schedule C was engaged in for profit" and that the activity did "not meet the guidelines of carrying on a trade or business within the meaning of Internal Revenue Code Section 162". Respondent therefore disallowed all of the

---

[5]In his posttrial brief petitioner analogizes Intcom to Berkshire Hathaway, one of the largest publicly traded companies in the world, whose controlling shareholder and chairman, Warren Buffett, consistently ranks among the world's wealthiest people and has earned the moniker "The Sage of Omaha" for his striking business investment acumen. Although we agree with petitioner that Berkshire Hathaway operates as a conglomerate, holding significant stakes in numerous other companies engaged in myriad lines of business, we do not think petitioner's comparison of Intcom to that company an apt one. From what little evidence petitioner introduced, it appears that Intcom does not operate any businesses. The only ventures not described as having been abandoned are its ownership of an interest in a graphic design company headquartered in the Philippines, possible establishment of a Filipino jewelry export business, and alleged efforts to "determine the feasibility of establishing" a bakery to serve call center workers and a REIT to invest in a real estate project, both in the Philippines.

[*8] deductions petitioner had claimed on his 2008 Schedule C, as there was no gross income in that year from this activity.

For 2009 respondent again determined that petitioner had not "establish[ed] that the activity on Schedule C was engaged in for profit" and that he had in any event not substantiated the expenses underlying his claimed deductions as actually paid, ordinary, and necessary to his business or profession. In addition to disallowing the deductions claimed on Schedule C, respondent moved petitioner's $5,000 of reported gross receipts from Intcom to his Form 1040 as "Other Income".

## OPINION

As a general rule, the Commissioner's determination of a taxpayer's tax liability is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). No section 7491 or Rule 142 basis exists for deviating from the general rule in these cases, so petitioner bears the burden of proof.

## I.  Intcom's For-Profit Status Under Section 183

The Code divides the universe of a taxpayer's activities into two groups: those engaged in for profit and those not engaged in for profit. Generally, expenses attributable to activities in the first group are deductible whereas

[*9] expenses attributable to activities in the second group are deductible only to the extent of the income they generate, subject to other limitations including those on deductions for personal expenses. See sec. 183(c) (defining an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212").

Thus, an individual taxpayer may deduct "ordinary and necessary expenses paid or incurred during the taxable year * * * for the production or collection of income", sec. 212(1), "for the management, conservation, or maintenance of property held for the production of income", sec. 212(2), or "in carrying on any trade or business", sec. 162(a). But if the activity generating the expenses the taxpayer seeks to deduct "is not engaged in for profit, no deduction attributable to such activity shall be allowed", except for (1) deductions that would be allowable regardless of the taxpayer's profit motive, and (2) "a deduction equal to the amount of the deductions which would be allowable" if the taxpayer had a profit motive, to the extent that his gross income derived from the activity exceeds the deductions allowable regardless of profit motive. Sec. 183(a) and (b). Respondent's principal contention in these cases is that Intcom was an activity not engaged in for profit, such that the foregoing section 183(a) restriction applies.

**[\*10]** Under our caselaw as well as that of the U.S. Court of Appeals for the Ninth Circuit, the key element that distinguishes an activity engaged in for profit from one not engaged in for profit is the taxpayer's motive.[6]  An activity is engaged in for profit if the taxpayer's "predominant, primary, or principal objective" in engaging in the activity is to realize an economic profit independent of tax savings.  See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212.  An activity need not show a profit if the taxpayer has an actual and honest objective of making one.  See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983).  So long as it is genuine, the taxpayer's profit expectation need not even be reasonable.  See id.  To ascertain a taxpayer's motive, we conduct "a careful analysis of all the surrounding objective facts, and greater weight is given to such facts than to his mere statement of intent."  Id.

The regulations under section 183 set forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit.  See sec.

---

[6]This Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone."  Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  When he filed his petition, petitioner lived in California, a State within the Ninth Circuit, so we will follow decisions of that Court of Appeals that are squarely in point.  See sec. 7482(b)(1)(A).

**[\*11]** 1.183-2(b), Income Tax Regs. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the taxpayer's expertise or that of his or her advisers; (3) the taxpayer's time and effort expended on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other similar or dissimilar activities; (6) the activity's history of income or losses; (7) the amount of occasional profits, if any, from the activity; (8) the taxpayer's financial status; and (9) the activity's elements, if any, of personal pleasure or recreation for the taxpayer.[7] Id.

---

[7]As he did in the earlier cases, petitioner in his posttrial brief challenges this regulation's validity. Petitioner's myriad objections may be loosely classified as challenges to the regulation's validity either on its face or as applied. With regard to the as-applied challenges, petitioner is tilting at windmills. There is no evidence in the record that respondent applied the standards or took the actions that petitioner claims he applied and did, and we will not adjudicate hypothetical questions.

As for the on-its-face challenges--to wit, petitioner's contentions that sec. 1.183-2(b), Income Tax Regs., violates the Regulatory Flexibility Act (RFA), 5 U.S.C. secs. 601-612 (2012), the Administrative Procedure Act (APA), 5 U.S.C. secs. 551-559, 701-706 (2012), and Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)--we found them so patently meritless in the earlier cases that we declined to even address them. Although the Court sees no more merit in petitioner's arguments on this round, that petitioner has raised them again suggests he fails to see their flaws, so we will briefly note them.

First, the RFA applies "only to rules for which a notice of proposed rulemaking is issued on or after January 1, 1981", see RFA, Pub. L. No. 96-354, sec. 4, 94 Stat. at 1170, so the regulations under sec. 183, which were published for notice and comment on August 19, 1971, see 36 Fed. Reg. 16112, 16117 (Aug. 19, 1971), and issued in final form on July 13, 1972, see 37 Fed. Reg. 13679,

(continued...)

**[\*12]** This Court regularly analyzes the foregoing factors, among other facts and

circumstances, in cases in which the Commissioner challenges the taxpayer's

claim of a profit motive, see, e.g., Metz v. Commissioner, T.C. Memo. 2015-54,

---

[7](...continued)
13683-13684 (July 13, 1972), cannot be subject to it. Second, petitioner contends that the regulation violates the APA but has not alleged that in adopting the regulation the Secretary failed to comply with any of the APA's substantive provisions, such as the notice-and-comment requirement. See generally 5 U.S.C. sec. 553 (2012). To the extent that petitioner desires to invoke "the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review", see Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. ___, ___, 134 S. Ct. 1377, 1389 (2014), petitioner has not clearly identified the statute he believes the Secretary has violated. He does assert that the regulation is at odds with sec. 183(d) and/or sec. 162, and we agree that his reading of the regulation does not align with those statutes. But petitioner's reading of the regulation is entirely without foundation in its text. The regulation does not require proof of any actual profit to establish a profit motive, nor has respondent taken the position that it does. Indeed, the regulation does not require any particular form of proof at all. Rather, the regulation's list of factors purports to serve as no more than a guide. It cautions that "[n]o one factor is determinative", that the list of factors is nonexclusive, and that a determination should not be made "on the basis that the number of factors * * * indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa." Sec. 1.183-2(b), Income Tax Regs. "[A]ll facts and circumstances with respect to the activity are to be taken into account." Id.
    Far from being arbitrary and capricious or contrary to law, the regulation reflects a reasonable construction of secs. 162, 183, and 212 and provides helpful guidance to taxpayers seeking to ascertain whether they may properly deduct expenses associated with a particular activity. In any event, the factors listed in the regulation were derived from caselaw, see Allen v. Commissioner, 72 T.C. 28, 33-34 (1979), so even if the regulation were invalid (which it is not), we would consider the very same factors in deciding whether petitioner had a profit motive.

[*13] at *3-*4; Shah v. Commissioner, T.C. Memo. 2015-31, at *25-*26; Savello v. Commissioner, T.C. Memo. 2015-24, at *7-*9, and the Court of Appeals for the Ninth Circuit has approved our application of the factors, see, e.g., Hill v. Commissioner, 204 F.3d 1214, 1218 (9th Cir. 2000); Wolf v. Commissioner, 4 F.3d at 713; Carter v. Commissioner, 645 F.2d 784, 786-787 (9th Cir. 1981), aff'g T.C. Memo. 1978-202.  The regulation's list of factors is nonexclusive, and "[n]o one factor is determinative".  Sec. 1.183-2(b), Income Tax Regs.  Further, we do not simply tally up the factors that favor each party's position.  See id.  Rather, we take into account "all facts and circumstances with respect to the activity", assigning each fact or circumstance the weight appropriate to its overall context, see id., in an effort to divine from these objective facts "'the taxpayer's subjective intent'", Wolf v. Commissioner, 4 F.3d at 713 (quoting Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1989), aff'g Patin v. Commissioner, 88 T.C. 1086 (1987)).

We apply these principles to ascertain whether in 2008 and 2009 Intcom was an activity engaged in for profit.[8]  We conclude that it was not.

---

[8]It is questionable whether Intcom, writ large, is the proper focus for our analysis.  Petitioner listed only one activity (Intcom) on his Schedules C, but he claims that Intcom has explored, and in some cases launched, a wide variety of business ventures. Under sec. 1.183-1(d)(1), Income Tax Regs., for purposes of

(continued...)

**[*14]** A.    The Manner in Which the Taxpayer Carries On the Activity

"The fact that the taxpayer carries on the activity in a businesslike manner

* * * may indicate that the activity is engaged in for profit."  Sec. 1.183-2(b)(1),

Income Tax Regs.  "What is relevant is whether * * * [the taxpayer] maintained

---

[8](...continued)
ascertaining whether a taxpayer has a profit motive, "where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity."
     The Court must consider all facts and circumstances to determine whether a taxpayer's separate undertakings constitute one activity for purposes of sec. 183. Id.  These include "the degree of organizational and economic interrelationship of various undertakings, the business purpose * * * served by carrying on the various undertakings separately or together * * * and the similarity of various undertakings."  Id.  We also consider, inter alia:  (1) "[w]hether the undertakings are conducted at the same place"; (2) "whether the undertakings were formed as separate businesses"; (3) "whether one undertaking benefited from the other"; (4) "the degree to which the undertakings shared management"; (5) "the degree to which one caretaker oversaw the assets of both undertakings"; (6) "whether the taxpayer used the same accountant for the undertakings"; and (7) "the degree to which the undertakings shared books and records".  See Mitchell v. Commissioner, T.C. Memo. 2006-145, 92 T.C.M. (CCH) 17, 19 (2006).
     Petitioner's claims regarding Intcom's activities suggest that these activities should not be analyzed in the aggregate.  Facts weighing against aggregation include:  that there was no apparent organizational or economic interrelationship among its activities; that carrying on such a range of dissimilar activities served no evident business purpose; that none of Intcom's activities appears to have benefited from any other activity; and that there is no evidence the undertakings maintained books and records, let alone that these books and records were shared.  Facts weighing in favor of aggregation include:  that Intcom's activities were largely conducted in two locations, the Philippines and Las Vegas, and that the activities allegedly shared management.  Although the relevant factors thus weigh heavily in favor of disaggregation, because we would reach the same ultimate conclusion regardless, we analyze Intcom's activities in the aggregate.

**[*15]** complete and accurate books and records, whether the activity was conducted in a manner substantially similar to other comparable businesses which are profitable, and whether changes were attempted in order to improve profitability." Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979).

Petitioner claims that "[r]ecords are kept" and that "[s]ome" of Intcom's ventures "have specific business plans and or prospectus." Except for petitioner's Schedules C, which are part of his Federal income tax returns, the record contains no evidence that petitioner prepared any budgets, profit or loss statements, balance sheets, or other financial analyses for Intcom, and no evidence that he maintained any books of accounting for Intcom as a whole or for any of its various ventures. The only business plan petitioner offered into evidence consists of a vaguely worded sentence fragment in a document he prepared in connection with the audit of his 2008 return. Cf., e.g., McMillan v. Commissioner, T.C. Memo. 2013-40, at *12 (noting that, although the taxpayer claimed to have a written business plan, she "did not present it at trial and did not attempt to orally explain her business plan during the trial").

Although petitioner compares Intcom to the famously profitable conglomerate Berkshire Hathaway, this comparison does not survive even superficial scrutiny, see supra note 5; and even if it did, petitioner has not

[*16] established that Intcom and Berkshire Hathaway conduct their activities in a "substantially similar" manner. Petitioner further asserts that he "[a]bandoned unsuccessful projects", but there is no evidence that he changed his investment methodology or business practices in response to these failures.

In sum, the record is devoid of the usual indicators of businesslike activity. The evidence that is in the record--a hodgepodge of receipts, credit card statements, invoices, and bills, none of which bears any clear relationship to Intcom's alleged operations and all of which could as easily represent personal expenditures--is not indicative of a commercial venture. Cf., e.g., Metz v. Commissioner, at *27-*32 (describing how taxpayers "used Quickbooks for bookkeeping and hired a CPA firm to perform monthly bank reconciliations, accounts-payable listings, [and] monthly profit-and-loss statements", hired legal counsel to prepare standard contracts, prepared annual written business plans, and extensively advertised and promoted their business). As a result, this factor favors respondent.

B.     The Taxpayer's Expertise or That of His Advisers

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer

[*17] carries on the activity in accordance with such practices."  Sec. 1.183-2(b)(2), Income Tax Regs.  Although "a taxpayer need not make a formal market study", he "should undertake a basic investigation of the factors that would affect profit".  See Westbrook v. Commissioner, T.C. Memo. 1993-634, 66 T.C.M. (CCH) 1823, 1827 (1993), aff'd, 68 F.3d 868 (5th Cir. 1995); see also Burger v. Commissioner, T.C. Memo. 1985-523, 50 T.C.M. (CCH) 1266, 1271 (1985) (finding that taxpayers who "undertook the activity with no concept of what their ultimate costs might be, how they might operate at the greatest cost efficiency, how much revenues they could expect, or what risks could impair the generation of revenues" did not "operate in a businesslike manner"), aff'd, 809 F.2d 355 (7th Cir. 1987).

Petitioner works full time as an attorney at a health care company.  He claims that Intcom has an "experienced and seasoned international management team" and that it works with, inter alia, "[d]iplomats, U.S. Attaché [sic], U.S. embassies, foreign consulates, trade organizations, trade delegating [sic], international trade shows, and various other resources within the United States and abroad."[9]  These generalized assertions carry little weight.  Petitioner has offered

---

[9]In his posttrial brief petitioner makes additional claims concerning, among other things, his own experience and background and the identities of agencies
(continued...)

**[\*18]** no evidence of the qualifications of his alleged management team, nor evidence that he himself possesses expertise relevant to, e.g., launching startup businesses, operating a bakery, importing military hardware, or investing in real estate--all of which Intcom allegedly did or attempted to do.

Petitioner contends that he "retained consultants with the necessary expertise to identify lucrative opportunities and advise on abandoning projects that m[a]y not generate profits." The evidence he provided to substantiate Intcom's claimed contract labor expenses consists entirely of receipts for and records of money transfers to a single individual, Avigel Hernandez. On two of the Western Union money transfer forms in the record, petitioner identified Ms. Hernandez as his "girlfriend". The record does not establish Ms. Hernandez's role in Intcom, her qualifications as an international business consultant, or what services she performed for Intcom.

Petitioner's monthly summary sheet included as an aspect of his substantiation evidence for September 2008 lists "Lunch at Traders with

---

⁹(...continued)
with whom he allegedly consulted before launching Intcom's various ventures. "Statements in briefs * * * do not constitute evidence and cannot be used as such to supplement the record." Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992); see also Rule 143(c). We disregard all factual assertions not supported by the evidence in the record.

[*19] consultant G. Ferrer et al. discuss various legal/business matters." Other monthly summary sheets list expenses exceeding $25 for gifts of clothing to G. Ferrer and "Nichibei Anime - gift to G. Ferrer" for January 2008 and April 2009, respectively. As with Ms. Hernandez, petitioner has not, by the mere note "Client Development", established G. Ferrer's role or qualifications or what services he or she performed for Intcom. Otherwise, the record does not disclose the existence, identity, or qualifications of any other "consultant".

Furthermore, petitioner has not shown that, on the front end, he took any steps to investigate the factors that would affect the profitability of each new venture. Nor has he established that, on the back end, he explored the reasons for a venture's failure and sought to learn from it so as to bring an end to Intcom's string of annual losses. Cf. Metz v. Commissioner, at *44 ("[K]nowledge of the activity itself apart from its economics is not enough to clear the hurdle: A taxpayer must demonstrate expertise and attempts to improve results in a money-losing business."). Thus, this factor favors respondent.

C.    The Taxpayer's Time and Effort Expended on the Activity

"[T]hat the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects," or withdraws "from another occupation to

[*20] devote most of his energies to the activity" "may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioner had a full-time attorney job during the tax years at issue. In the document he submitted to respondent objecting to respondent's adjustments to his 2008 tax return, he claimed that he spent 10-20 hours per week on Intcom during 2008. In his posttrial brief he asserts that he devoted "on average approximately 30 hours per week". Petitioner introduced no evidence to corroborate either number. Although the evidence does show that petitioner traveled to the Philippines, he did not elaborate on the nature of his activities there and how they related to Intcom's profitability. Cf. Mitchell v. Commissioner, T.C. Memo. 2001-269, 82 T.C.M. (CCH) 732, 736 (2001) (finding this factor neutral where the taxpayer "worked on the farm 750 to 2,000 hours per year" but "did not explain how the work he performed there related to making a profit").

A taxpayer need not personally devote substantial time to an activity if "the taxpayer employs competent and qualified persons to carry on such activity." Sec. 1.183-2(b)(3), Income Tax Regs. As noted above, petitioner introduced evidence of money transfers to his girlfriend, Ms. Hernandez, allegedly as payments for contract labor in connection with Intcom, but there is no evidence of what she did, let alone whether she was competent and qualified. The record is similarly devoid

[*21] of evidence showing the competence or qualifications of any other alleged

Intcom consultant or employee.  This factor favors respondent.

      D.      <u>The Expectation That Assets Used in the Activity May Appreciate in Value</u>

> The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity.  Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. * * *   [Sec. 1.183-2(b)(4), Income Tax Regs.]

Petitioner contends that Intcom "[t]ook [an] equity position as payment for

present and future services" to a graphic design company allegedly launched in

2005, and that as of 2008 he continued to own stock in the company, was on the

board of directors, and acted as its legal counsel.  He did not introduce evidence

that he was paid for his services or that the stock had increased in value since its

acquisition or was likely to do so in future.  Cf. <u>McMillan v. Commissioner</u>, at *17

(where the taxpayer argued that she believed her activity's "only significant asset"

would appreciate in value, but objective facts indicated this belief was wholly

unfounded, finding that this factor weighed in favor of respondent).  The record

contains no other evidence concerning any assets used in Intcom's activities, the

**[\*22]** appreciation of which might offset or exceed the continual losses from its operation.  This factor is neutral.

      E.      <u>The Taxpayer's Success in Carrying On Other Similar or Dissimilar Activities</u>

"[T]hat the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable."  Sec. 1.183-2(b)(5), Income Tax Regs.

Aside from his involvement in Intcom, petitioner works full time as an attorney for Monarch.  He earns substantial wage income, from which we infer that he has proven at least reasonably successful in that role.  In our opinion in the earlier cases, we noted that petitioner had "apparently successfully run and operated a legal practice, some elements of which may be similar to Intcom's needs."  See <u>Strode v. Commissioner</u>, T.C. Memo. 2012-59, 103 T.C.M. (CCH) 1276, 1278 (2012).  He has not, however, introduced evidence that he has ever converted any enterprise from unprofitable to profitable or that he conducts Intcom in a manner similar to legal work.  <u>Cf.</u> <u>Gardner v. Commissioner</u>, T.C. Memo. 2014-148, at \*57 (where the taxpayer had also engaged successfully in "real estate and insurance" activities but "introduced little evidence as to the

[*23] manner in which he conducted these businesses", finding this factor neutral).

This factor is neutral.

F.      The Activity's History of Income or Losses

With respect to this factor, section 1.183-2(b)(6), Income Tax Regs.,

provides as follows:

> A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.  However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.  If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit.  A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

Petitioner has filed Schedules C for Intcom since at least 2003, so the

activity was in at least its sixth and seventh years during the years at issue.  While

it is plausible that the "start-up stage" for an international consulting business

might embrace these years, cf., e.g., Engdahl v. Commissioner, 72 T.C. at 669

(noting that "[t]he start-up phase of an American saddle-bred breeding operation is

**[\*24]** 5 to 10 years"), we can only speculate on this point, as petitioner introduced no evidence concerning it.

For the tax years at issue petitioner reported net losses from Intcom of $88,184 and $86,808. Five continuous years of net losses preceded them.[10] In each of the three subsequent years, petitioner again reported net losses from Intcom. All evidence in the record indicates that Intcom has never been profitable. In fact, petitioner reported gross receipts from Intcom on only 1 of the 10 consecutive income tax returns in the record. For 2009 petitioner reported earning gross receipts of $5,000 from Intcom, as against $91,808 of expenses. Although Intcom reported lesser net losses for 2010 through 2012 than it had in prior years, it reported no income for those years. As was true in the earlier cases, "[t]here is no indication that losses are subsiding with time", see Strode v. Commissioner, 103 T.C.M. (CCH) at 1279, or that Intcom would be profitable in 2008 and/or 2009. This factor favors respondent.

---

[10]Petitioner claims, without any other proof, that three of Intcom's 2005 ventures--a beauty salon and two livestock projects in the Philippines--were abandoned because a typhoon destroyed their business assets and because "$10,000 of profits" was stolen during a robbery. Floods and theft would qualify as unforseen factors outside petitioner's control. We note, however, that for 2005 petitioner reported no gross receipts (let alone $10,000 of profit) on his Schedule C and did not claim a theft loss deduction. In any event, we considered his 2005 tax year in the earlier cases.

**[\*25]** G.  The Amount of Occasional Profits, If Any, From the Activity

"The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent." Sec. 1.183-2(b)(7), Income Tax Regs. From the evidence in the record, it appears that Intcom has yet to turn a profit. Indeed, according to its income tax returns, it has yielded income in only 1 year of out of 10, and then in an amount dwarfed by its expenses. Moreover, nothing in the record indicates the source(s) of that income, the $5,000 of gross receipts petitioner reported on his 2009 Schedule C. The only evidence of the income's existence is the number on petitioner's tax return. Petitioner has not shown Intcom actually generated these receipts. Thus, he has not established that Intcom's operation has ever yielded income, let alone profit.

Petitioner contends that a bona fide profit motive may exist in the absence of profit. We do not disagree. But over time, where no objective facts manifest a profit motive, the continual absence of profit--indeed, the continual absence of income--renders the existence of such a motive increasingly less plausible. This factor favors respondent.

**[*26]** H.    The Taxpayer's Financial Status

On one hand, "that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs.  On the other hand, "[s]ubstantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit". Id.  As we have explained:  "[T]he regulation merely makes the commonsense point that the expectation of [being] able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur." See Engdahl v. Commissioner, 72 T.C. at 670.  "Clearly, the tax incentive for incurring large expenditures in a hobby-type business * * * [is] much greater for one who has a great deal of income from other sources." Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

During 2008 and 2009 petitioner worked full time as an attorney.  He earned salary income of $159,229 in 2008 and $165,305 in 2009.  Netting his claimed losses from Intcom against these figures reduced his adjusted gross income to $77,329 for 2008 and to $94,710 for 2009.  Petitioner had substantial income from

**[\*27]** another source, and losses from Intcom enabled him to cut his adjusted gross income approximately in half.  This factor favors respondent.

> I.  The Activity's Elements, If Any, of Personal Pleasure or Recreation for the Taxpayer

Although it is not "necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits", a taxpayer's "personal motives in carrying on * * * an activity may indicate that the activity is not engaged in for profit".  Sec. 1.183-2(b)(9), Income Tax Regs.  Nevertheless, "a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility."  Jackson v. Commissioner, 59 T.C. at 317.

The evidence in the record indicates that the activities petitioner attributes to Intcom may have entailed substantial personal pleasure or recreation to him, and that petitioner deducted as business expenses expenditures he would have incurred regardless for personal reasons.  See sec. 262(a).  To substantiate the expenses underlying his claimed deductions he introduced reams of receipts, credit card statements, invoices, and bills.  Aside from the money transfers to Ms. Hernandez (allegedly for contract labor) discussed above, the underlying expenses apparently consist of, among other things:  (1) air travel, ground transportation, lodging,

[*28] meal, and incidental expenses petitioner incurred for travel to and within the Philippines, as well as for, on one occasion, coincident travel within that country by Ms. Hernandez; (2) petitioner's subscriptions to the Los Angeles Times and to the magazines The Week, Esquire, Golf, and Saveur; (3) cable, Internet, and telephone service, apparently for petitioner's home, as well as mobile telephone service; (4) petitioner's auto, health, and life insurance;[11] (5) petitioner's annual California Bar membership dues, charges associated with his mandatory continuing legal education (MCLE) requirement, and his 2009 membership fee for the Divers Alert Network; (6) meals; (7) mailing and office supplies; and (8) foreign transaction fees and finance charges imposed by various credit card providers, as well as records of ATM withdrawals made against credit cards.

Petitioner's travel records suggest that he made at least six trips to the Philippines in 2008 and 2009 and that while there, he stayed in hotels, including Manila's Makati Shangri-La, Mandarin Oriental, Hyatt Hotel and Casino, and Traders Hotel, on at least two occasions with a guest. He enjoyed in-room minibars and room service and also dined out. Petitioner prepared and included a "Business Travel & Expense Report" for each trip on which he described the trips'

---

[11]Petitioner's substantiation evidence for his health and life insurance premium payments consists of earnings statements provided by his employer, Monarch, which deducted them from his paychecks.

**[*29]** purpose as, uniformly, "[a]ssist client with [b]usiness [o]pportunities in Philippines/[p]ursue [b]usiness [o]ps.". The records themselves do not in any way support this claimed purpose. On the contrary, traveling to a foreign and perhaps exotic locale and staying in fine hotels is not an uncommon leisure activity; these records could as easily substantiate petitioner's vacations as business expenses associated with Intcom.

Similarly, his other records bear the hallmarks of personal expenses, and he has made no attempt to explain how they relate to Intcom. Many people enjoy reading the newspaper and magazines to which petitioner subscribed, watching cable television, and using the Internet. We doubt that he derived pleasure, per se, from his California Bar membership, from participating in MCLE, or from maintaining life, health, and auto insurance. But even assuming that these expenses bore some relationship to Intcom's business (an assumption that is dubious, at best), petitioner surely derived personal satisfaction or contentment from incurring and paying these expenses under the umbrella of Intcom given that he would likely have had to incur and pay them in any event. Although life and health insurance were, for the years at issue, elective, petitioner presumably needed to maintain his California Bar membership to continue working as an

[*30] attorney at Monarch, and California law obliged him to insure his vehicle. Cal. Veh. Code sec. 16020 (West 2000 & Supp. 2015).

In sum, the evidence in the record suggests that Intcom's alleged activities may have yielded considerable pleasure to petitioner and may as likely have been personal as business expenses. See secs. 162(a), 262(a). As is true in the present cases, in the earlier cases petitioner did not testify at trial, and no witness testified on his behalf. We noted in our opinion "that petitioner's failure to introduce evidence 'which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable'". Strode v. Commissioner, 103 T.C.M. (CCH) at 1279 (quoting Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947)). The same presumption applies here. This factor favors respondent.

J.    Conclusion

Among the foregoing factors, none provides an objective foundation for petitioner's claim that he operated Intcom with a subjective expectation of and motivation to obtain profit. Taking into account all of the relevant facts and circumstances, we conclude that petitioner has not carried his burden of establishing that Intcom was an activity engaged in for profit. Our Opinion in

[*31] Dreicer v. Commissioner, 78 T.C. at 645-646, supports this conclusion and provides a remarkably fitting coda to our analysis:

> Mr. * * * [Strode] would have us find that he was like the wildcat driller or the inventor * * * , continuing his endeavors in the face of adverse results in the hope of one day reaping a large profit. However, such statement of intent is not supported by the objective facts of this case. For many years, he sustained large losses; there was no realistic possibility that he could ever earn sufficient income from his activity to offset such losses * * * ; he was able to continue to bear such losses only because of his large resources * * * ; a review of the entire record fails to convince us that Mr. * * * [Strode] conducted his activities in a businesslike manner calculated to earn a profit * * * . Rather, there is a strong indication that he enjoyed his life of travel. * * *

We will sustain respondent's disallowance of petitioner's claimed Schedule C deductions for 2008 and 2009, except as otherwise determined below.

II.     Availability of Deductions Under Section 183(b)

Section 183(b) allows a taxpayer two categories of deductions with respect to an activity not engaged in for profit. Under section 183(b)(1), the taxpayer may deduct expenses attributable to the activity to the extent the Code allows them regardless of the activity's for-profit status. Under section 183(b)(2), a taxpayer may deduct expenses attributable to an activity not engaged in for profit to the extent that they (1) do not exceed his gross income from the activity for that year, reduced by the amount of deductions allowable under sec. 183(b)(1); and (2)

**[\*32]** would have been allowable under the Code had the activity been engaged in for profit. In other words, section 183(b)(2) permits the taxpayer to deduct expenses that would be allowable under sections 162(a), 212(1), and/or 212(2) if the activity were engaged in for profit, subject to a cap equal to gross income from the activity less section 183(b)(1) deductions.[12]

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any claimed deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). A taxpayer must identify each deduction

---

[12]Any deductions allowable under sec. 183(b)(2) "are subject to the limit of section 67(a) (i.e., as 'miscellaneous itemized deductions' allowable only to the extent that in the aggregate they exceed 2 percent of adjusted gross income) because they are not among those excluded from that limit by section 67(b)." Bailey v. Commissioner, T.C. Memo. 2012-96, 103 T.C.M. (CCH) 1499, 1522 (2012), aff'd, 2014 WL 1422580 (1st Cir. 2014); see also, e.g., Purdey v. United States, 39 Fed. Cl. 413, 417 (1997) ("[D]eductions solely permitted pursuant to § 183(b)(2) are miscellaneous itemized deductions."); sec. 1.67-1T(a)(1)(iv), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988) ("Examples of expenses that, if otherwise deductible, are subject to the 2-percent floor include but are not limited to * * * [e]xpenses for an activity for which a deduction is otherwise allowable under section 183."). Shifting petitioner's allowable deductions with respect to Intcom, if any, from Schedule C to Schedule A, Itemized Deductions, aligns with respondent's determination in the notice of deficiency transferring the $5,000 of gross receipts petitioner reported on Schedule C to Form 1040, line 21, Other Income. Petitioner has not established specifically what Intcom did to earn the alleged gross receipts and from whom and under what circumstances it received them. Petitioner has not specifically disputed respondent's determination regarding the gross receipts, and we will sustain it.

[*33] available, show that he or she has met all requirements therefor, and keep books or records that substantiate the expenses underlying the deduction. Sec. 6001; Roberts v. Commissioner, 62 T.C. 834, 836 (1974). The fact that a taxpayer claims a deduction on an income tax return is not sufficient to substantiate the underlying expense. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Rather, an income tax return "is merely a statement of the * * * [taxpayer's] claim * * * ; it is not presumed to be correct." Roberts v. Commissioner, 62 T.C. at 837.

A.    Section 183(b)(1) Deductions

The Court has reviewed the expenses reported on petitioner's 2008 and 2009 Schedules C and the evidence he submitted to substantiate them. For 2008 we have identified no expenses for which deductions are permitted by the Code regardless of profit motive and thus allowable under section 183(b)(1). For 2009, however, we have found two types of expenses that meet this test.

Under section 170(a)(1), a taxpayer may deduct any charitable contribution made during the taxable year, but only if the contribution is "verified under regulations prescribed by the Secretary." A "charitable contribution" is a contribution or gift for the use of a donee identified in section 170(c). Sec. 170(c). The Secretary's regulations call for verification of a cash charitable contribution with a canceled check, a receipt, letter, or other communication from the donee

[*34] showing the organization's name and the amount and date of the contribution, or other reliable written records. Sec. 1.170A-13(a)(1), Income Tax Regs. Petitioner claimed $100 of "[d]onations" as an other expense on his 2009 Schedule C. After perusing petitioner's substantiation evidence, we have found adequate documentation for $41 of the claimed amount. Specifically, petitioner introduced a receipt from KPFK Radio showing total payments during 2009 of $135, "[p]remiums" of $94 provided in exchange, and a net deductible amount of $41. The tax identification number listed on the receipt is that of Pacific Foundation Radio, which was in 2009 a qualified organization within the meaning of section 170(c). Petitioner's summary sheet for his June 2009 Intcom expenses indicates that he made the donation on June 25, 2009. He may deduct this $41 charitable contribution on Schedule A in addition to the $151 he originally claimed on that schedule.

Under section 212(3), an individual taxpayer may deduct all "ordinary and necessary expenses paid or incurred during the taxable year * * * in connection with the determination, collection, or refund of any tax." In addition to the $1,200 deduction for tax preparation fees petitioner claimed on Schedule A, he deducted $7,480 for "[a]ccounting" as an other expense on Schedule C. Among the items petitioner provided to substantiate his Intcom expenses are: (1) an invoice from

[*35] "William Wagstaff/Income Tax Shelter" reflecting a $1,480 fee for the preparation of petitioner's 2008 Federal and California income tax returns, with $1,200 shown as paid and $280 as due; and (2) four canceled checks from petitioner to Mr. Wagstaff, for an aggregate amount of $6,280, with notations on the memo lines indicating that they were for a retainer, the balance of Mr. Wagstaff's fee for preparing petitioner's 2008 tax returns, and something related to "2005 TAX". Mr. Wagstaff signed petitioner's 2008 and 2009 Forms 1040 as the returns' paid preparer. It appears that petitioner double-counted his initial $1,200 payment to Mr. Wagstaff, and respondent has not disallowed his Schedule A deduction for that amount. We conclude, however, that petitioner has adequately substantiated an additional $6,280 of ordinary and necessary expense paid or incurred during 2009 in connection with the determination of his tax obligations.

In sum, under section 183(b)(1), for 2009 petitioner is entitled to an additional $41 charitable contribution deduction and an additional $6,280 deduction for tax return preparation.

B. Section 183(b)(2) Deductions

For two reasons, petitioner is not entitled to any deductions under section 183(b)(2). First, deductions under section 183(b)(2) are limited to gross income

**[\*36]** from the not-for-profit activity less deductions allowable under section 183(b)(1). Petitioner reported no gross receipts from Intcom for 2008. For 2009 he reported gross receipts of $5,000, and we have already allowed a greater amount of expense under section 183(b)(1). Consequently, his section 183(b)(2) limitation is zero for both years.

Second, with the exception of those allowed above, petitioner has not adequately substantiated his reported Intcom expenses. Pursuant to section 162(a), a taxpayer may deduct all of the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on the taxpayer's trade or business. Lucas v. Commissioner, 79 T.C. 1, 6 (1982). "To qualify as an allowable deduction under [section] 162(a) * * * an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). A taxpayer must establish these essential elements with credible evidence. See sec. 1.6001-1(a), Income Tax Regs. Deductions are allowed under section 212(1) and (2) for ordinary and necessary expenses paid in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

**[*37]** A taxpayer must satisfy a heightened substantiation requirement with respect to certain types of expenses. Section 274(d) provides that no deduction shall be allowed for, among other things, traveling expenses, entertainment expenses, gifts, and expenses with respect to listed property (as defined in section 280F(d)(4) and including passenger automobiles, computer equipment, and in the years at issue and up until 2010, cellular telephones) "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement": (1) the amount of the expenditure or use; (2) the time and place of the expenditure or use; (3) the business purpose of the expenditure or use; and (4) the business relationship to the taxpayer of the party entertained, using the facility, or receiving the gift. Sec. 274(d).

While business expenses and expenses for the production of income are generally deductible, personal, living, and family expenses are typically nondeductible. See sec. 262(a). A business expense claimed as a deduction must be incurred primarily for business rather than personal reasons. See Walliser v. Commissioner, 72 T.C. 433, 437 (1979). Where an expense exhibits both personal and business characteristics, the "test * * * requires a weighing and balancing of all the facts * * * bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for

[*38] business expenses." <u>Sharon v. Commissioner</u>, 66 T.C. 515, 524 (1976) (citing costs of commuting and ordinary clothing as examples of expenses helpful and necessary to an individual's employment that are "essentially personal" and hence nondeductible), <u>aff'd per curiam</u>, 591 F.2d 1273 (9th Cir. 1978).

Petitioner's remaining reported expenses are not deductible under these rules. For purposes of section 162, one critical element is missing from petitioner's substantiation evidence: He has not established with credible evidence that the expenditures for which he claimed deductions on his Schedules C were "directly connected with or pertaining to * * * [his] trade or business". <u>See</u> sec. 1.162-1(a), Income Tax Regs. Indeed, he has not established with credible evidence that Intcom <u>was</u> yet a trade or business. Moreover, turning to section 274, several categories of petitioner's expenses, including, but not limited to, his mobile telephone, travel, gifts, and meal expenses, are subject to heightened substantiation requirements. <u>See</u> secs. 274(d)(1), (4), 280F(d)(4)(i), (ii), (v). Petitioner's evidence does not fulfill his burden of substantiating the business purpose of any of the documented expenditures. For purposes of section 212(1) and (2), the record is silent as to the source of petitioner's $5,000 of 2009 income from Intcom, so we cannot ascertain whether any of his expenses were ordinary and necessary for the production or collection of that income. Finally, in reference

**[\*39]** to section 262(a), as discussed <u>supra</u> pp. 27-31, petitioner's claimed Intcom expenses exhibit characteristics of personal expenses, and he has not established that he incurred them primarily for business rather than personal reasons.  <u>See</u> <u>Walliser v. Commissioner</u>, 72 T.C. at 437.  For all of these reasons, we conclude that petitioner has not adequately substantiated any of the expenses claimed on his 2009 Schedule C other than those we have found deductible under section 183(b)(1).[13]

## III.   Accuracy-Related Penalty Under Section 6662

In each of the notices of deficiency respondent determined an accuracy-related penalty under section 6662(a) and (b)(1), (2), and (3) on the basis of negligence or disregard of rules and regulations, a substantial understatement of

---

[13]We have considered and rejected the possibility that petitioner's California Bar membership dues and MCLE expenses may have been deductible under secs. 67(a) and 162(a) as unreimbursed employee business expenses related to his employment as an attorney for Monarch.  It is well settled that an employee may not deduct otherwise valid unreimbursed business expenses if the employee is entitled to reimbursement from his or her employer for such expenditures.  <u>Orvis</u> <u>v. Commissioner</u>, 788 F.2d 1406, 1408 (9th Cir. 1986), <u>aff'g</u> T.C. Memo. 1984-533, 48 T.C.M. (CCH) 1295 (1984); <u>Lucas v. Commissioner</u>, 79 T.C. 1, 7 (1982).  An employee taxpayer bears the burden of proving that claimed business expenses were not reimbursable by his or her employer.  <u>See</u> <u>Christine v. Commissioner</u>, T.C. Memo. 2010-144, 99 T.C.M. (CCH) 1591, 1593 (2010), <u>aff'd</u>, 475 Fed. Appx. 259 (9th Cir. 2012).  Petitioner has not met that burden here.

**[\*40]** income tax, or a substantial valuation misstatement.[14]  As a general rule, the

Commissioner bears the burden of production and "must come forward with

sufficient evidence indicating that it is appropriate to impose the relevant penalty."

Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also sec. 7491(c).  Once

the Commissioner has met this burden of production, the burden will shift to the

taxpayer to prove that he has an affirmative defense or that he is otherwise not

liable for the penalty.  See Higbee v. Commissioner, 116 T.C. at 446-447.

Section 6662(a) and (b)(1) and (2) provides for the imposition of a 20%

penalty on the portion of an underpayment of tax attributable to negligence or

disregard of rules and regulations or a substantial understatement of income tax,

respectively.  "'[N]egligence' includes any failure to make a reasonable attempt to

---

[14]These represent alternative grounds for imposition of the penalty, as the accuracy-related penalties do not stack.  See sec. 1.6662-2(c), Income Tax Regs.
Sec. 6662(a) and (b)(3) provides for the imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement.  For returns filed after August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)".  Sec. 6662(e)(1)(A).  The notice of deficiency does not explain what property's value or adjusted basis was allegedly misstated.  Respondent did not discuss this issue at trial and has not addressed it on brief.  As the Court can find no basis for this penalty in the record, we find petitioner not liable for the substantial valuation misstatement penalty.

[*41] comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c). It is "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules and regulations includes any careless, reckless, or intentional disregard of the Code, the regulations, or certain IRS administrative guidance. Id. subpara. (2). A substantial understatement of income tax as to an individual taxpayer is generally an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

Respondent did not specifically address the negligence penalty at trial or on brief. Nevertheless, we note that petitioner's failure to adequately substantiate expenses underlying any of his claimed Schedule C deductions constitutes negligence for purposes of section 6662(a). See sec. 1.6662-3(b)(1), Income Tax Regs. Likewise, "attempt[s] to deduct personal expenses in contravention of the plain language of section 262 constitute[] negligence." Bond v. Commissioner,

[*42] T.C. Memo. 2012-313, at *13-*14 (fn. ref. omitted); accord, e.g., Cor v. Commissioner, T.C. Memo. 2013-240, at *8; WSB Liquidating Corp. v. Commissioner, T.C. Memo. 2001-9, 81 T.C.M. (CCH) 1007, 1012 (2001). Petitioner failed to establish any business purpose for the expenses he sought to deduct on Schedule C, nearly all of which had a personal character. Respondent has satisfied his burden of production with regard to the negligence penalty.

He has also met that burden with regard to the substantial understatement penalty. On his Forms 1040 petitioner reported total tax of $11,839 for 2008 and $15,692 for 2009. We have concluded above that we will sustain all of respondent's adjustments in the notices of deficiency to petitioner's 2008 and 2009 income tax returns. As recomputed in the 2008 notice of deficiency, petitioner's total tax liability for 2008 was $36,052. Therefore, for 2008 petitioner understated his income tax by $24,213, which is more than both $5,000 and 10% of the tax required to be shown on his return. As recomputed in the 2009 notice of deficiency, petitioner's total tax liability for 2009 was $31,182, and his understatement of income tax was $15,496.[15] Those recomputed numbers do not

---

[15]In the notice respondent determined that petitioner was not entitled to the $6 making work pay and Government retiree credit he had claimed on his 2009 tax return and so reduced the amount of tax reported on the return from $15,692 to $15,686.

[*43] take into account the additional Schedule A deductions allowed in this opinion, but even leaving aside that the additional section 212(3) deduction will be subject to the 2% "haircut", it is readily apparent that petitioner's understatement will exceed both $5,000 and 10% of his tax liability.  Consequently, he is liable for the accuracy-related penalty for underpayments attributable to substantial understatements of income tax for both tax years.

Petitioner did not specifically dispute the penalties in his petition, presented no evidence or argument concerning them at trial, and did not address them in his posttrial brief.  He has not proved that he has an affirmative defense or that he is otherwise not liable for the penalties, see Higbee v. Commissioner, 116 T.C. at 446-447, so we will sustain respondent's determination of the 20% penalty for both tax years.

The Court has considered all of the parties' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decisions will be entered under

Rule 155.